**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HEALTH AND HAPPINESS
INTERNATIONAL HOLDINGS LIMITED,

    Plaintiff,

    v.

STOLTZE SPECIALTY PROCESSING,
LLC AND MAPLE ISLAND, INC.,

    Defendants.

Docket No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Health and Happiness International Holdings Limited by its attorneys, Greenberg Traurig, LLP, as and for its Complaint alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.    This action is brought by Health and Happiness International Holdings Limited, formerly known as Biostime International Holdings Limited ("H&H" or "Plaintiff") to seek damages for Defendants' intentional, and material anticipatory breach of their obligations under a loan agreement dated September 6, 2012 (the "Loan Agreement", a true and correct copy of which is annexed hereto as **Exhibit A**), a security agreement dated September 6, 2012 (the "Security Agreement", a true and correct copy of which is annexed hereto as **Exhibit B**), and a promissory note dated September 6, 2012 (the "Promissory Note", a true and correct copy of which is annexed hereto as **Exhibit C**)[1]. Under those agreements (and other accompanying documents), H&H

---

[1] The Promissory Note was amended three times to extend the Maturity Date of the loan, most recently on May 11, 2022.

loaned Stoltze Specialty Processing, LLC ("SSP") $6.3 million dollars[2] for SSP to lease land from its affiliate and, co-defendant, Maple Island, Inc. ("MI" and when together with SSP, "Defendants"), next to MI's facility in Medford, Wisconsin and to construct two buildings on the land to be used as part of a cereal processing operation. The remaining proceeds from the loan were to be used to buy the equipment necessary to establish the cereal processing operation, and for start-up costs and initial working capital.

2.      SSP recently informed H&H they are committing an Act of Insolvency under Section 5.5 of the Loan Agreement and exiting the business and that they, along with MI have determined to anticipatorily breach the Loan Agreement (and Promissory Note) by affirmatively and unequivocally informing H&H that they would not be repaying the loan in its entirety, as they are required to do. SSP has also intentionally and materially anticipatorily breached a Security Agreement they entered into with H&H. Under the Security Agreement, H&H was granted a first priority lien in the buildings and equipment that resulted from the proceeds under the Loan Agreement. However, in blatant disregard for the Loan Agreement, SSP have now informed H&H they won't honor their obligations and have sold certain equipment at auction, without H&H's consent breaching Section 4.2.3 of the Loan Agreement. Worse, they have offered H&H only a portion of the resulting funds, when the Security Agreement grants H&H all proceeds (or income) from any sale. This Event of Default under Section 5 of the Loan Agreement and breach of the Security Agreement is so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.

---

[2] With interest, the balance due as of November 30, 2022, is $7,808,280.00. To date, only $379,427.00 has been repaid, all of which went towards accrued interest. No payments have been made since 2016.

3.     Indeed, instead of fulfilling their obligations to H&H, Defendants have suggested there is only one option; that the equipment and buildings are sold, and H&H is provided with 50% of the proceeds. Defendants suggest this knowing their own appraisals show that doing so would result in H&H recovering only a small fraction of the loan SSP agreed to repay and MI guaranteed. H&H has explicitly rejected this course of action. In violation of the various agreements, however, SSP moved forward with their sale of the equipment, without H&H's consent, which resulted in approximately $700,000.00 in proceeds. However, instead of giving all proceeds to H&H, as required by Section 2(b) the Security Agreement, SSP has informed H&H that they intend to only provide 50% of the proceeds to H&H and to use the remaining funds to pay its partners and unsecured creditors instead. This breach is so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.

4.     Moreover, in discussions between the parties prior to the commencement of this action, Defendants threatened to further deplete their cash position (which includes the proceeds from the equipment sale) to pay their legal fees in any action initiated by H&H. This essentially amounted to an attempt to extort an agreement out of H&H wherein H&H would accept only a small fraction of what they are owed for fear that even that small fraction might otherwise disappear.

5.     Even though the parties have entered into a series of agreements that require Defendants to repay the loan in full, Defendants have asserted they will not pay what they owe. Defendants say this is because, *inter alia*, they have put more money into their operation than H&H, and because they have other creditors and also partners that they intend to repay from the proceeds from the sale of the collateral, as defined under Section 2 of the Security Agreement (the "Collateral") without regard for their obligations to H&H under the loan documents.

3

6.      Further, one of the agreements, the Promissory Note, contains a Guaranty, executed by MI in favor of H&H. Under the plain language of that agreement MI, "absolutely, unconditionally, and irrevocably guarantee[d] . . . the full and prompt payment by Maker [SSP] of all amounts outstanding" (Ex. C p. 4) and further, provided that MI's liability is "irrevocable, continuing, absolute, and unconditional" (Ex. C p. 4) and that MI "irrevocably waives, any defenses to enforcement it may have now or in the future". *Id.*

7.      SSP has also anticipatorily breached the Security Agreement by informing H&H it would sell the Collateral it had granted H&H a first priority lien in, without H&H's consent, and then refusing to ever turn over all (or any of) the proceeds from the sale, as the Security Agreement requires. This was an unequivocal statement by SSP that they have no intention of honoring their obligations.

8.      Because of Defendants' anticipatory breaches of the various agreements, H&H, as the non-breaching party is excused from its obligations. Because of this, and additionally, due to SSP committing an Act of Insolvency, H&H is within its rights to accelerate the total amount due under the loan pursuant to Section 5.7.2 of the Loan Agreement and demand payment immediately.

## **PARTIES**

9.      Plaintiff H&H (formerly known as Biostime International Holdings Limited, herein, "Biostime") is a limited liability company, organized and existing under the laws of Hong Kong.

10.     Defendant SSP is a limited liability company, organized and existing under the laws of Minnesota.

11.     Defendant MI  is a corporation organized and existing under the laws of Minnesota.

## JURISDICTION AND VENUE

12.     This court has subject matter jurisdiction over this matter pursuant to 18 U.S.C. § 1332(a)(2) because Plaintiff is a citizen of a foreign state, Hong Kong, and Defendants are citizens of Minnesota, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13.     This court has personal jurisdiction over the parties because pursuant to Section 6.2 of the Loan Agreement and Section 18 of the Security Agreement, the parties have agreed to submit to the exclusive jurisdiction of the federal (or state) courts of New York. In the Loan Agreement and Security Agreement, the parties specifically identified the Southern District of New York ("Southern District") as the proper jurisdiction and venue for this matter. Specifically, in Section 6.2 of the Loan Agreement, H&H and SSP specifically identify the Southern District as the proper court to hear this matter. In that provision, Defendants "irrevocably and unconditionally submit[ted] . . . to the exclusive general jurisdiction of the courts of the State of New York, the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts thereof. Further, SSP consented to venue here, and explicitly "waive[d] any objection" that it had then or now to the Southern District being the proper venue. As to MI, they signed on to the Promissory Note as Guarantor and that agreement subjects the parties to the exclusive jurisdiction of the State and Federal courts in New York.

## FACTS

14.     In 2012, SSP requested a loan of $6,300,000 from H&H. The proceeds of the loan were to be used by SSP for: (i) constructing two new buildings on land leased from MI adjacent to MI's facility in Medford, Wisconsin that were to be used as the site for a baby cereal processing operation; (ii) procuring and installing the equipment necessary to establish a baby cereal

5

processing operation for H&H in the two new facilities (that were to be operated by SSP); and (iii) start-up costs and initial working capital.

15.     On September 6, 2012, the parties agreed on a structure for the loan and entered into a series of agreements to effectuate it: (i) H&H entered into the Loan Agreement under which it loaned $6.3 million to SSP; (ii) H&H entered into the Security Agreement with SSP under which SSP granted H&H a first priority lien and security interest in and to all of SSP's rights, title, and interest in its fixtures, personal property, proceeds or products therefrom, and any securities, chattel paper, insurance proceeds, etc., which lien secured  SSP's payment and performance under the Loan Agreement; (iii); SSP executed the Promissory Note to pay $6.3 million in favor of H&H, which MI guaranteed through a Guaranty in favor of H&H  (the "Guaranty") and under which H&H performed; (iv) H&H and MI entered into a Mortgage and Security Agreement and Fixture Financing Statement (the "Mortgage Agreement", a true and correct copy of which is annexed hereto as **Exhibit D**) under which MI's obligations under the Promissory Note were secured with MI's real and personal property at the Medford, Wisconsin site; and (v) H&H entered into a Supply Agreement (the "Supply Agreement", a true and correct copy of which is annexed hereto as **Exhibit E**) with SSP and MI.[3]

16.     As of November 30, 2022, the balance due on the loan (including interest) was $7,808,280.00.

---

[3] Hereinafter, the term "Loan Documents" shall mean the Loan Agreement, Security Agreement, and the Promissory Note.

**The September 6, 2012 Agreements**

**A. The Loan Agreement**

17.     The Loan Agreement was entered into on September 6, 2012, by SSP and H&H[4]. Under the Loan Agreement, H&H agreed to loan SSP up to $6.3 million, and SSP did draw down the full amount.

18.     Section 5 of the Loan Agreement, "Events of Default," identifies the circumstances under which SSP would be in default. Among the Events of Default identified are if "Borrower shall fail to pay within ten (10) days of the due date any installment of either principal or interest due on the [Promissory] Note . . . " (Ex A, p. 7).

19.     Section 5 of the Loan Agreement also identifies other Events of Default, such as: (i) the failure to perform any obligation in the affirmative and negative covenant sections of the Loan Agreement for a period of 15 days; (ii) the failure to perform any other covenant contained in the Loan Agreement for a period of thirty (30) days after written notice thereof; (iii) insolvency, including, among other things, inability to pay debts as they mature, suspension of ordinary business operations, and federal bankruptcy; and (iv) if any representation or warranty contained in the Loan Agreement proves to be materially false. (Ex A, p. 7).

20.     Section 5.5 of the Loan Agreement, "Insolvency" identifies various Acts of Insolvency, which includes if "Borrower shall (i) become insolvent or unable to pay its or his debts generally as they mature, (ii) suspend its ordinary course of business, (iii) make a general assignment for the benefit of creditors, (iv) admit in writing its or his inability to pay its or his debts generally as they mature" among other things. (Ex A, p. 7).

---

[4] On September 6, 2012, at the time all of the Loan Documents were entered into, H&H was known by its former name, Biostime International Holdings Limited and therefore it is Biostime on the agreements.

21.     Section 4.1.6, "Maintenance of Security Interest," is an affirmative covenant that requires SSP to "Maintain in favor of Lender a legal, valid and enforceable first priority security interest in the property of Borrower to be secured under the Security Agreement and the Ground Lease Mortgage". (Ex A, p. 6).

22.     Section 4.2.1, "No Indebtedness" is a negative covenant that requires SSP to not "create, incur, assume, or be liable for any indebtedness, other than indebtedness incurred under the Loan Documents". (Ex A, p. 6).

23.     Additionally, Section 5.8, "Lender Protection" states that "Until the Maturity Date, in order to preserve Lender's rights in the property encumbered by the Security Agreement  .  .  . Borrower shall comply with all requirements of each of the Security Agreement…and, in the event that Borrower fails to do so, upon the occurrence of an Event of Default, Lender shall have the right to commence an action against Borrower  .  .  .  and Borrower shall be responsible for all of Lender's out of pocket costs and expenses (including reasonable attorneys' fees) associate with such action". (Ex A, p. 8).

24.     The Loan Agreement provides H&H with various remedies, and only those remedies upon the occurrence of an Event of Default, including allowing H&H to call in, or accelerate all amounts due, immediately. Section 5.7.1 allows H&H to terminate future advances; Section 5.7.2 allows H&H, upon written notice to SSP, to accelerate all amounts, including accrued interest outstanding under the agreements; and, Section 5.7.3, entitled "Foreclosure and Enforcement of Security Interest" states that, Lender may, in accordance with the terms and conditions of the Mortgage or Security Agreement and subject to applicable law, foreclose the Mortgage or enforce any security interest under the Security Agreement. (Ex A, p. 7-8).

25.     Section 5.7.3 of the Loan Agreement also notes that "Maple Island has guaranteed the obligations of Borrower pursuant to the Guaranty" which is attached to and a part of the Note. Indeed, by the plain language of the third paragraph of the Guaranty, MI guaranteed that it will answer for SSP's debt to H&H and waived any and all defenses against doing so. (Ex A, p. 8).

26.     While under the language of the agreement H&H is not allowed to exercise the remedies under 5.7.2 and 5.7.3 until either the maturity date of the loan, or the occurrence of an Act of Insolvency (defined in paragraph 26 below), because SSP has committed an anticipatory breach of this agreement by informing H&H of its unequivocal decision to not repay H&H in full, and because it has committed an Act of Insolvency, H&H no longer has to live up to its obligations under the agreement and can therefore take advantage of the remedies the contract provides without delay.

27.     Notwithstanding paragraph 25 above, Section 5.7.3 states that Lender may only exercise the rights under Section 5.7. of the Loan Agreement until the earlier of: (a) Maturity Date or (b) the occurrence of an Act of Insolvency. Section 5.5 of the Loan Agreement prescribes that an "Act of Insolvency" includes, amongst other things, the Borrower "[suspending] its ordinary course of business" and "admit in writing its inability to pay its or his debts generally as they mature".

**B.  The Security Agreement**

28.     Like the other documents, the Security Agreement was entered into on September 6, 2012. The parties to the Security Agreement are H&H and SSP. By its terms, the Security Agreement gives H&H a first priority lien and security interest in the Collateral.

29.     Under Section 1(c) of the Security Agreement, "First Priority" means "with respect to any lien and security interest purported to be created in any Collateral pursuant to this

Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the Loan Agreement)". (Ex. B, p. 1). Additionally, Proceeds is defined as *inter alia* "all dividends or other income from the Collateral". (Ex. B, p. 2).

30.     However, under the Loan Agreement, SSP cannot create any liens on the Collateral in favor of those other than H&H because Section 4.2.2 of the Loan Agreement states that Borrower "shall not" "[c]reate, incur, assume or allow any lien on the property covered by the Security Agreement, except for liens in favor of the Lender". (Ex. A, p. 6). In other words, there is no situation whereby H&H's first priority becomes subordinated to the interest of some other creditor, like SSP and MI are doing here by splitting the proceeds of their sale of the equipment to which H&H has first priority with their partners and other creditors.

31.     Under Section 2 of the Security Agreement, SSP "pledges and grants to the Secured Party [H&H], and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of its right, title and interest in and to" the Collateral identified in Section 2(a) and 2(b). Section 2(a) grants the First Priority lien to "all fixtures and personal property of every kind and nature;" and 2(b) to "all proceeds and products of each" of the fixtures.[5] (Ex. B, p. 2).

32.     The Security Agreement goes on to identify, in Section 3, that the Collateral "secures the payment and performance of . . .  [SSP's] obligations . . . under the Loan Agreement…with respect to the due and punctual payment of (i) the principal of and premium, if any, any interest on the Loans…when and as due…and (ii) all other obligations or liabilities…of the Grantor under the Loan Agreement  . . .  " *Id.*

---

[5] Note that the Security Agreement erroneously refers to Section 2 being subject to Section 2(c) which is not included in this agreement. This may have been a provision in an earlier draft of the agreement.

10

33.     Section 7(d) of the Security Agreement prohibits the sale of the collateral, stating, "[t]he Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer . . . any of the Collateral". (*Id.* p. 6).

34.     Section 18 of the Security Agreement incorporates Section 6.2 of the Loan Agreement, and therefore the terms and conditions of the Security Agreement are governed by New York law and the forum selection provision of Section 6.2 of the Loan Agreement (which identifies the Southern District as the proper jurisdiction and venue for this action). (Ex. B, p. 10).

### C. The Promissory Note and Guaranty

35.     The Promissory Note, also effective as of September 6, 2012, was executed by SSP in favor of H&H. In the Promissory Note, SSP promised to repay "the principal amount of $6,300,000, or so much thereof as is advanced…and remains outstanding, plus interest thereon". (Ex. C, p. 1). Additionally, under the Promissory Note H&H promised to loan SSP up to $6.3 million and did do so.

36.     Indeed, immediately upon the execution of the agreements, $5.4 million was drawn down immediately while the remaining $900,000.00 was advanced to SSP in December of 2013. With these two transfers, H&H performed its obligations under the Promissory Note.

37.     The Promissory Note further set out the schedule under which SSP was to repay the loan to H&H and identified the loan's original maturity date as December 18, 2018. The maturity date has since been extended a number of times to June 30, 2023, through amendments to the Promissory Note.

38.     Additionally, the Promissory Note provides on page 2 that "[t]he occurrence of an Event of Default under the Loan Agreement shall constitute an Event of Default under this Note,

11

and, upon such occurrence, Lender shall have the rights and remedies set forth in Section 5 of the Loan Agreement". (Ex C, p. 2).

39.     Under the Promissory Note, SSP further "agree[d] to pay all fees, costs and expenses of the holder of this Note (including reasonable attorneys' fees) in connection with the collection of the amounts outstanding under this Note, including any fees, costs and expenses related to the enforcement of any security interest arising under the Loan Documents or any other security interest in favor of Lender". (Ex. C, p. 2).

40.     The Promissory Note also includes a Guaranty, executed by MI wherein MI "absolutely, unconditionally, and irrevocably guarantees, as primary obligor and not merely as surety, the full and prompt payment by Maker of all amounts outstanding under the Loan Documents, as where required thereby". (Ex. C, p. 4).

41.     The Guaranty goes on the state that the "liability of Guarantor hereunder is irrevocable, continuing, absolute and unconditional and the Obligations of Guarantor hereunder, to the fullest extent permitted by applicable law, shall not be discharged or impaired or otherwise effected by, and Guarantor hereby irrevocably waives, any defenses to enforcement it may have now or in the future". *Id.*

42.     The Promissory Note was amended three times, each time to extend the maturity date of the loan. The current maturity date is June 30, 2023. Each amendment provides that other than the extension to the maturity date, all other terms and conditions of the original Promissory Note (including the Guaranty) remain in full force and effect.

43.     Similar to the other documents, the Promissory Note includes a choice of law provision that says the Promissory Note "shall be governed by and construed in accordance with

the internal laws of the State of New York…and Maker and Lender each hereby submit to the exclusive jurisdiction of the State and Federal courts in New York". (Ex. C, p. 2).

### D.  The Mortgage Agreement

44.  Also on September 6, 2012, H&H, as Mortgagee, and MI, as Mortgagor, entered into the Mortgage Agreement, "[t]o secure the payment to the Mortgagee  .  .  .  of $6,300,000 according to the terms of that certain Promissory Note  .  .  .  and guaranteed by Mortgagor". (Ex. D, p. 1).

45.  Under paragraph one of the "Covenants and Agreements" provision of the Mortgage Agreement, H&H holds "a first priority mortgage" under the Real Property and Personal Property listed therein. *Id.* p. 3.

46.  The Real Property subject to the Mortgage Agreement is MI's property in Medford, Wisconsin; which includes specifically, *inter alia*, "the real property and all buildings, structures, improvements, fixtures, annexations  .  .  .  " The Personal Property subject to the Mortgage Agreement includes, *inter alia*, "all buildings, equipment, fixtures, improvements, building supplies and materials and personal property owned by the Mortgagor and now or hereafter attached to an necessary to the use of the improvements on the Premises". *Id.* p. 1.

47.  The Mortgage Agreement included a number of covenants, including Covenant 2, "Payment of Indebtedness" under which, subject to the express provisions of the "Loan Documents, [MI] (i) guarantee[d] the due and punctual payment of each and every installment of the principal and interest on the Note". *Id.* p. 3.

### E.  The Supply Agreement

48.     Finally, on September 6, 2012, H&H, SSP, and MI also entered into the Supply Agreement.

49.     The Supply Agreement establishes: (i) that H&H desired to engage MI for the purpose of processing certain products; (ii) that MI accepted such engagement on the terms and conditions contained in the Supply Agreement; and (iii) that in order for MI to process the products according to certain specification and to ensure that H&H was supplied with the agreed capacities, SSP would invest in two buildings and equipment adjacent to MI's existing production facilities in Medford, Wisconsin, for which H&H would provide financing as set forth in the various other agreements.

50.     Further, under the Supply Agreement, those buildings and equipment would be (and were) used by SSP to produce baby cereal and supply it to H&H.

### SSP and MI Inform H&H they are Exiting the Cereal Business

51.     On June 16, 2021, Greg Johnson ("Johnson"), CEO of MI, and President of SSP informed Laetitia Garnier of H&H that they were "looking at getting out of the baby cereal business and closing Stoltze Specialty Processing" because "volumes are still far from where we can maintain a viable business and there are no prospects for meaningful improvement", even though doing so would be an Act of Insolvency under Section 5.5 of the Loan Agreement which would allow H&H to accelerate all amounts owed immediately.

52.     In that same email, Johnson suggested that the equipment and building have some limited liquidation value that could eventually be realized and suggested that a fair resolution to winding up the business would seem to be to split the value that can be realized and terminate the

contract and note. This course of action represented the first suggestion of an anticipatory breach by Defendants of what is provided for in the Loan Documents.

53.    Then, during the fall of 2021 and stretching into 2022, H&H and the Defendants discussed the wind-up process. During these discussions, Defendants positively and unequivocally stated more than once that according to them a "fair resolution is to split the proceeds and terminate the contract and note" even though, as the appraisals that Defendants commissioned show, doing so would result in H&H recouping only a fraction of the amount it was due, a number which as of November 30, 2022, stood at $7,808,280.00.

**Defendants Have Building and Equipment Appraised and Move Forward with a Sale**

54.    On March 31, 2022, Johnson shared two appraisals with H&H; one for the building, and one for the equipment secured by the Security Agreement. He also wrote that these are the remaining assets of SSP.

55.    The appraisal of the building was performed by JLL Valuation Advisory and put the building's value at $310,000. The appraisal of the equipment was performed by Gordon Brothers Asset Advisors, who valued the equipment at between $690,650 (forced liquidation value) and $932,300 (orderly liquidation value). Selling these assets and splitting the proceeds evenly, as Defendants suggested, in contravention of the Loan Documents would see H&H come up severely short in recouping its loan.

56.    On May 4, 2022, Johnson wrote again, informing H&H that "later today we are meeting with an organization that will help us with how best to dispose of the equipment". Further, Johnson again reiterated that he believed the "most fair" resolution was the split he suggested in his June 16, 2021, email and stated that "we would like to ensure you are in agreement with our approach **before we move ahead".** (emphasis added.)

57.     After the parties exchanged correspondence in May regarding another amendment to the Promissory Note (to extend the maturity date), Johnson wrote H&H again, on May 27, 2022, unequivocally stating in part:

> We will soon have an offer on the equipment that we anticipate will be between $500,000 and $600,000. In the appraisal selling ourselves through an auction or selling orderly had estimates of $655,000 to $785,000. So there are some decisions to be made. The Building had an appraised value of $310,000. In summary we are looking at up to a million dollars of potential net proceeds.
>
> Our position is still that splitting the proceeds evenly seems the fairest option.

58.     On June 29, 2022, H&H replied to Johnson, flatly rejecting his suggestion of a sale and even split of the proceeds, asserting that as far as a sale was unacceptable because, "we don't have the same alignment on sharing of proceeds as per contract. So, I would suggest to have an alignment before the green light is given". Indeed, H&H never gave its consent to SSP to sell the equipment and instead continued to demand full payment from SSP and MI of the amount due even though they both have continue to refuse to meet this obligation.

**Defendants Proceed with Equipment Sale, Without H&H's Consent**

59.     Even though Johnson wrote in his email of May 4, 2022, that he wanted to ensure H&H was in agreement with Defendants' approach **before we move ahead**, and even though H&H explicitly and unambiguously rejected Defendants suggested approach on June 29, 2022, on September 29, 2022, Defendants informed H&H that an auction for the sale of the equipment secured by the Security Agreement had been completed, with an expectation that the proceeds from the auction will be $700,000.00.

60.     This indicated to H&H that Defendants had gone through with their suggested course of action and sold the equipment, without H&H's consent and in turn had again

16

unequivocally expressed their decision not to fulfill their repayment obligations under the Loan Documents.

61.     In response, on October 4, 2022, H&H issued a notice of breach under the Loan Agreement for its refusal to repay the loan and under the Security Agreement for the sale of equipment by SSP without H&H's consent, as required by Section 7(d) of the Security Agreement and Section 4.2.3 of the Loan Agreement.

**Defendants Respond to, and Reject H&H's Demand**

62.     On October 7, 2022, counsel for H&H wrote to Johnson to follow up on H&H's October 4 notice of breach. In that letter, H&H told Defendants that it objected to the sale of the equipment or the real or personal property at the cereal processing facility and demanded the full repayment of the $6.3 million loan in accordance with the terms of the Loan Agreement.

63.     In that same letter, counsel for H&H demanded "that SSP/MI confirm in writing" by October 12, that:

> (a) the outstanding amount of the $6.3 million loan will be repaid to H&H in full on or before the loan maturity date of June 30, 2023; and (b) SSP/MI will immediately transfer to H&H any cash proceeds received from the unauthorized sale of secured property in breach of the SSP security Agreement and MI Mortgage, such proceeds to be applied towards satisfaction of the outstanding loan amount

64.     Finally, H&H warned Defendants that should they intentionally continue to refuse to satisfy their obligations, that H&H would pursue legal remedies.

65.     On October 12, 2022, Defendants again made clear that they have no intention of complying with their obligations under the Loan Documents. Indeed, Defendants, through counsel, informed H&H that "any claim for payment of the loan evidenced by the Loan Document is rejected" before offering a number of reasons why they were refusing to meet their obligations, in breach of same.

66.     In their letter of October 12, Defendants first assert that they should not have to pay what they owe because, according to them, the agreements between the parties evidence a "joint venture" that the parties viewed as a "partnership," even though no joint venture or partnership was ever created. Indeed, the only document Defendants have ever pointed at to support their "joint venture" idea is the Promissory Note's last paragraph which allows H&H to convert a portion of the loan debt to equity in SSP – however, H&H has never made such an election. Further, H&H did not, did not intend to, and does not believe that it formed a joint venture with Defendants.

67.     Defendants further assert that they should not have to pay because "MI and its shareholders have made loans to SSP which total approximately $11,000,000 . . . and which loans remain outstanding" as if other financial entanglements in which Defendants have involved themselves bear on Defendants' obligations to H&H or defeat the security interest granted to H&H under the Security Agreement. Defendants also mention their retained earnings deficit as a reason they cannot pay. This has no legal import with respect to H&H's right to repayment.

68.     Finally, Defendants noted H&H's objection to the sale of the equipment subject to the Security Agreement, but acknowledged they plan to disregard their obligations under that agreement for the benefit of their creditors. However, other obligations are of no consequence with respect to H&H's right to full repayment of the $6.3 million loan. The Security Agreement grants H&H a first priority lien and security interest in the equipment in question. The Security Agreement defines First Priority as the most senior lien, meaning any alleged fiduciary duty SSP has to its partners is subordinate to the first priority lien SSP granted H&H in the Security Agreement.

69.     Not only have Defendants anticipatorily breached the Loan Agreement and Security Agreement by selling the Collateral without H&H's consent, but they have also

anticipatorily, and materially breached the Loan Agreement by positively and unequivocally informing H&H that they did not intend to fully repay the loan, but instead would only be offering H&H half the proceeds from the sale of the building and equipment and otherwise disregarding the Promissory Note and its obligations. Moreover, Defendants have essentially threatened to fight any legal action initiated against it by using the proceeds from the Collateral that H&H holds a security interest in.[6] This threat amounts to a bad faith attempt to extort an agreement out of H&H.

**Defendants Inform H&H Their Remaining Collateral Is Essentially Worthless**

70.     In a series of emails in early November between H&H and Johnson, Johnson revealed what he believed the liquidation values were for the remaining property (both real and personal) that H&H had a security interest in, namely the property in Medford secured under the Mortgage Agreement.

71.     On November 10, 2022, Johnson put the value of the Medford equipment at $587,000; and the value of the building and land at $300,000. However, he then stated that the "building is almost a liability and would take a long time to dispose of", that they "put a nominal value on the this which is likely too high" and that "liquidating the Medford assets would take time and result in significant carrying costs which would greatly eat into these values".

72.     Later that day H&H expressed its surprise at the low value of the Medford real estate and equipment and noted that the value of the secured assets only covered a fraction of the loan amount. Further, H&H recalled a conversation with Johnson from 2017 wherein it was told

---

[6] Indeed, in an October 12, 2022 letter from Defendant's counsel to counsel for H&H, essentially reiterated this veiled threat, writing "we believe that a better use of SSP's and MI's remaining assets (rather than for litigation costs) would be a settlement of your client's claim" implying both that Defendants intend to use assets that should rightly go to H&H to defend *against* H&H and also that Defendants must believe H&H's claims have merit, since they offered to settle.

(potentially fraudulently) by Johnson that the buildings are still worth significant amounts and that there was a lot more backing the loan than appeared on its face.

73.     In response, Johnson said that more wear and tear and the inability to sell as a going concern was to blame.

## FIRST CLAIM
### (Anticipatory Breach of the Loan Agreement)

74.     H&H repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

75.     On September 6, 2012, H&H entered into a valid and enforceable agreement, the Loan Agreement with SSP, whereby H&H made a loan of up to $6.3 million available to SSP. SSP has since taken the loan in its entirety, immediately drawing down $5.4 million upon execution of the various agreements and the remaining amount of $900,000.00 in December of 2013 and yet has unequivocally stated it has no intention of fulfilling its obligations under the Loan Agreement.

76.     Beginning when SSP informed H&H they intended to exit the cereal processing business, SSP (and MI) have stated to H&H that they did not intend to repay H&H in full.

77.     Indeed, on occasions after that, Defendants unequivocally informed H&H that they believed the best course of action was to sell SSP's building and equipment, give H&H half of those proceeds (estimated at approximately half of one million dollars) and terminate the Loan Documents. This would leave H&H in a position where it recoups only a fraction (approximately 6%) of the outstanding amount of the loan (plus interest), which as of November 30, 2022 stood at $7,808,280.00.

78.     Then, even though H&H objected to Defendants' plan, Defendants went ahead with it anyway, selling the equipment H&H was the first priority lien holder on and then telling H&H it would only give them half of the proceeds at most, because they wanted to pay their partners

and creditors instead. H&H interpreted this to be another unequivocal statement of anticipatory breach of the Loan Agreement.

79.     By reason of SSP's anticipatory breach of the Loan Agreement (and MI's of the Guaranty backing it), H&H is excused from further performance of any of its obligations under the Loan Agreement.

80.     By reason of Defendants anticipatory breach of the Loan Agreement, H&H can now immediately accelerate the full amount due under the loan and demand payment immediately from Defendants.

81.     By reason of Defendant's anticipatory breach of the Loan Agreement, H&H has suffered damages in an amount to be determined at trial.

## SECOND CLAIM
### (Breach of the Loan Agreement – Act of Insolvency)

82.     H&H repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

83.     The September 6, 2012, Loan Agreement between H&H and SSP is a valid and enforceable contract.

84.     Section 5 of the Loan Agreement, "Events of Default" identifies the events by which SSP would be in default of the Loan Agreement.

85.     One Event of Default, identified in Section 5.5 is "Insolvency". According to the plain language of the Loan Agreement, Insolvency includes (amongst other things) when the "Borrower shall (ii) suspend its ordinary course of business". (Ex. A, p. 7).

86.     Section 5.7 of the Loan Agreement identifies the "Lender Remedies" that Lender can implement upon the occurrence of an Event of Default. These remedies cannot be exercised until the earlier of (a) the Maturity Date, or (b) the occurrence of an Act of Insolvency.

87.     As discussed in more detail above, SSP informed H&H that it was winding down its cereal operation, or in other words, suspending its ordinary course of business, thereby committing an Act of Insolvency. On information and belief, SSP has suspended ordinary course of business operations.

88.     Included in the remedies in Section 5 is Section 5.7.2, "Accelerate" which says that Lender may, at its option, by providing notice in writing to Borrower accelerate all amounts, including accrued interest, outstanding under the Loan Documents. (Ex. A, p. 8).

89.     H&H provided written notice to Defendants on October 4, 2022, that they were demanding the full repayment of the outstanding amount of the loan in accordance with the Loan Agreement.

90.     As a result of SSP's Act of Insolvency, SSP has committed a material breach of the Loan Agreement and H&H has suffered damages, in an amount to be determined at trial.

### THIRD CLAIM
### (Breach of the Loan Agreement – Breach of Covenant)

91.     H&H repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

92.     The September 6, 2012, Loan Agreement between H&H and SSP is a valid and enforceable contract.

93.     Section 5 of the Loan Agreement, "Events of Default" identifies the events by which SSP would be in default of the Loan Agreement.

94.     Section 5.2 of the Loan Agreement (a subsection of Section 5) is titled "Certain Covenants or Agreements Herein". Under the plain language of Section 5.2(a), Borrower shall default in the due performance or observance of any term, covenant or agreement contained in Section 4.2 and such default shall continue for a period of (15) days.

95.     One of the covenants contained in Section 4.2 is the covenant in Section 4.2.1 titled "No Indebtedness", which says that Borrower shall not create, incur, assume, or be liable for any indebtedness, other than indebtedness incurred under the Loan Documents.

96.     Here, SSP has materially breached that covenant by its own admission, by becoming indebted to other creditors and its partners. Indeed, that indebtedness is at least part of the reason SSP has given H&H for why it cannot fulfill its obligations to H&H under the Loan Agreement – because it is indebted to and needs to pay its other creditors and partners.

97.     SSP's indebtedness has continued for a period of at least 15 days and thus continues a default under Section 5.2(a) of the Loan Agreement. As a result of this default, SSP is in material breach of the Loan Agreement and has harmed and damaged H&H, in an amount to be determined at trial.

**FOURTH CLAIM**
**(Breach of the Loan Agreement – Breach of Covenant)**

98.     H&H repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

99.     The September 6, 2012, Loan Agreement between H&H and SSP is a valid and enforceable agreement.

100.    Section 5 of the Loan Agreement, "Events of Default" identifies the events by which SSP would be in default of the Loan Agreement.

101.    Section 5.3 of the Loan Agreement (a subsection of Section 5) is titled "Other Covenants or Agreements Herein". Under the plain language of Section 5.3, Borrower shall default in the due performance or observance of any term, covenant or agreement contained in the Loan Agreement if the default continues for a period of 30 days after written notice thereof.

102.    Section 4.2.3, of the Loan Agreement, a covenant titled "No Disposition of Assets" says borrower shall not convey, sell, lease, transfer, assign, or otherwise dispose of all or any part of the property covered by the Security Agreement, except in the ordinary course of business.

103.    Here, SSP informed H&H in October of 2022 that they had sold the Collateral under the Security Agreement, in default of Section 4.2.3. On October 4, 2022, H&H provided written notice to SSP that SSP had defaulted under Section 4.2.3 of the Loan Agreement by reason of SSP's unauthorized sale of the Collateral. The default continued for a period of 30 days after H&H's written notice thereof, and thus constitutes a material breach of Section 5.3 of the Loan Agreement.

104.    As a result of this default, SSP is in material breach of the Loan Agreement and has harmed and damaged H&H, in an amount to be determined at trial.

**FIFTH CLAIM**
**(Breach of the Security Agreement)**

105.    H&H repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

106.    On September 6, 2012, H&H entered into the valid and enforceable Security Agreement with SSP whereby H&H was granted a first priority lien to the Collateral.

107.    Under Section 2 of the Security Agreement, SSP "pledges and grants to the Secured Party [H&H], and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of its right, title, and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired". (Ex. B, p. 2).

108.    Section 2 goes on further to specifically identify the Collateral to include: (a) "all fixtures and personal property of every kind and nature . . . " and (b) "all Proceeds and products of each of the foregoing . . . " This includes the equipment SPP purchased with the loan proceeds

24

to initially set up the cereal processing plant, and the proceeds SSP received from its unauthorized sale of same. *Id.*

109.    Section 1(c) states that First Priority "means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest in the most senior lien to which such Collateral is subject (subject only to liens permitted under the Loan Agreement)". (Ex. B, p. 1).

110.    However, under the Loan Agreement, SSP cannot create any liens on the collateral in favor of those other than H&H because Section 4.2.2 of the Loan Agreement states that Borrower "shall not" "[c]reate, incur, assume or allow any lien on the property covered by the Security Agreement, except for liens in favor of the Lender". In other words, there is no situation whereby H&H's first priority becomes subordinated to the interest of some other creditor, like SSP and MI are doing here. (Ex. A, p. 6).

111.    Further, under Section 7(d), which states that "Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer…any of the Collateral". (Ex. B, p. 6).

112.    Here, SSP has materially breached the Security Agreement by selling various Collateral without H&H's consent. SSP has further materially breached the Security Agreement by not providing "all proceeds" from the sale to its First Priority lien holder, H&H. SSP has unequivocally expressed to H&H its decision to keep at least half of the money to pay its creditors and partners, even though any interest they may have in the collateral is subordinate to H&H's.

113.    As a result of SSP's material breaches of the Security Agreement, H&H has suffered damages in an amount to be determined at trial.

## SIXTH CLAIM
### (Anticipatory Breach of the Promissory Note)

114.    H&H repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

115.    On September 6, 2012, H&H and SSP entered into the valid and enforceable Promissory Note whereby SSP promised to repay H&H the principal amount of the loan plus interest pursuant to a repayment schedule set forth in Section "A" of the Payments section of the document.

116.    Further, under the Promissory Note, SSP agreed to pay all costs, fees, and expenses of the Note holder, including attorneys' fees in connection with collecting the amounts due under the note.

117.    The Promissory Note also included a Guaranty, executed by MI wherein MI "absolutely, unconditionally, and irrevocably guarantees, as primary obligor and not merely as surety, the full and prompt payment by Maker of all amounts outstanding under the Loan Documents, as where required thereby". (Ex. C, p. 4).

118.    The Guaranty goes on the state that the "liability of Guarantor hereunder is irrevocable, continuing, absolute and unconditional and the Obligations of Guarantor hereunder, to the fullest extent permitted by applicable law, shall not be discharged or impaired or otherwise effected by, and Guarantor hereby irrevocably waives, any defenses to enforcement it may have now or in the future". *Id.*

119.    However, notwithstanding SSP's promise to repay, and MI's guarantee of that promise, Defendants have unequivocally informed H&H that they do not intend to fulfill their repayment obligations under these documents. In other words, they have anticipatorily breached the Promissory Note and Guaranty.

120.    By reason of Defendants anticipatory breach of the Promissory Note and Guaranty, H&H is excused from further performance of any of its obligations under the Promissory Note and Guaranty.

121.    By reason of Defendants anticipatory breach of the Promissory Note and Guaranty, H&H can now immediately demand payment immediately from Defendants.

122.    By reason of Defendant's anticipatory breach of the Promissory Note and Guaranty, H&H has suffered damages in an amount to be determined at trial.

### SEVENTH CLAIM
### (Attorneys' Fees and Costs)

123.    H&H repeats and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

124.    Pursuant to paragraph 3 of the "Other Provisions" Section of the Promissory Note, SSP "agrees to pay all fees, costs and expenses of the holder of this Note (including reasonable attorneys' fees) in connection with the collection of amounts outstanding under this Note…"

125.    Further, Section 5.8, of the Loan Agreement, "Lender Protection" states that "Until the Maturity Date, in order to preserve Lender's rights in the property encumbered by the Security Agreement…Borrower shall comply with all requirements of each of the Security Agreement…and, in the event that Borrower fails to do so, upon the occurrence of an Event of Default, Lender shall have the right to commence an action against Borrower…and Borrower shall be responsible for all of Lender's out of pocket costs and expenses (including reasonable attorneys' fees) associate with such action".

126.    As a result of Defendants anticipatory breach of the Loan Documents, H&H is entitled to recover its reasonable attorney's fees, costs, and expenses in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, H&H respectfully requests that this Court:

a)      On the First Cause of Action, enter judgment in H&H's favor, and against Defendants declaring that Defendants anticipatorily breached the Loan Agreement and awarding damages in an amount to be determined at trial;

b)      On the Second Cause of Action, enter judgment in H&H's favor, and against SSP declaring that SSP breached the Loan Agreement and awarding damages in an amount to be determined at trial;

c)      On the Third Cause of Action, enter judgment in H&H's favor, and against SSP declaring that SSP breached the Loan Agreement and awarding damages in an amount to be determined at trial;

d)      On the Fourth Cause of Action, enter judgment in H&H's favor, and against SSP declaring that SSP breached the Loan Agreement and awarding damages in an amount to be determined at trial;

e)      On the Fifth Cause of Action, enter judgment in H&H's favor, and against SSP declaring that SSP breached the Security Agreement and awarding damages in an amount to be determined at trial;

f)      On the Sixth Cause of Action, enter judgment in H&H's favor, and against Defendants declaring Defendants anticipatorily breached the Promissory Note and awarding damages in an amount to be determined at trial;

g)      On the Seventh Cause of Action, award H&H its attorneys' fees, costs, and expenses;

h)      Such further and other relief as this Court deems just, equitable, and proper.

## <u>JURY TRIAL DEMAND</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial on all issues so triable.


Dated: New York, New York
      December 8, 2022

                     GREENBERG TRAURIG, LLP

                     */s/ Jennifer A. Surprenant* _____

                     Jennifer A. Surprenant
                     Adam Kirschbaum
                     One Vanderbilt Avenue
                     New York, NY 10017
                     Tel. +1 212.801.9200
                     surprenantj@gtlaw.com
                     kirschbauma@gtlaw.com

                     Michael A. Nicodema
                     777 South Flagler Drive.
                     Suite 300 East
                     West Palm Beach, FL 33401
                     Tel. +1 973.360.7932
                     nicodermam@gtlaw.com

                     *Attorneys For Plaintiff Health and Happiness*
                     *International Holdings Limited*